TJOFLAT, Circuit Judge,
concurring in part, dissenting in part:
I concur in the court’s judgment reversing Dominguez’s convictions for the 8 U.S.C. § 1324(a)(l)(A)(ii)[1] transporting violations, Counts 44 through 48, and the 8 U.S.C. § 1324(a)(l)(A)(iii)[2] harboring violations, Counts 49 through 53. I dissent, however, from court’s affirmance of Dominguez’s convictions for conspiring, in violation of 18 U.S.C. § 371,[3] to commit those offenses and the smuggling offense, 8 U.S.C. § 1324(a)(2)(B)(ii), Count 1; for attempted smuggling, in violation of 8 U.S.C. § 1324(a)(2)(B)(ii), Counts 5, 6, 10, 13, and *1076 19; and for smuggling, in violation of 8 U.S.C. § 1324(a)(2)(B)(ii), Counts 28, 29, 33, 35, and 40.[4]
My disagreement with the court primarily rests on four grounds. First, because I conclude that proof of general criminal intent is a required element of the § 1324(a)(2)(B)(ii) offenses, I would reverse Dominguez’s convictions for those offenses and the conspiracy offense, and remand for a new trial. The district court committed reversible error in excluding evidence of the federal immigration policy governing the status Cuban refugees and in preventing Dominguez from contending that he did not intend to do something the law forbids — to act with criminal intent— when he arranged to bring the players to the United States so they could be granted asylum. The court then compounded the error when it failed to instruct the jury that it could not find Dominguez guilty of the § 1324(a)(2)(B)(ii) offense unless it found that he acted “willfully.”[5] Second, even if criminal intent is not required for a § 1324(a)(2)(B)(ii) conviction, it was required for the Count 1 § 371 conviction, because the indictment, the Government’s requested jury instructions, and the instructions the court gave all required the jury to find that Dominguez acted “willfully,” thereby placing Dominguez’s intent— his mens rea defense — at issue. Third, if the first two grounds are without merit, the evidence Dominguez wanted to introduce was necessary to consider whether he knew or acted in reckless disregard of the aliens’ status; hence, its exclusion constituted reversible error. Fourth, and by no means the least important, is that the today’s criminal intent holding creates a circuit split.
In essence, the district court denied Dominguez a fair trial by depriving him of the opportunity to present his mens rea defense to Counts 1, 5, 6, 10, 13,19, 28, 29, 33, 35, and 40[6] — that he brought the Cuban baseball players to the United States for a lawful purpose, so they could be granted asylum and paroled in accordance with the federal immigration policy governing the status of Cuban refugees, as expressed in the Cuban Adjustment Act, 8 U.S.C. § 1255,[7] the Meissner Memoran *1077 dum,[8] and the Wet-Foot/Dry-Foot policy.[9]
To demonstrate these errors, I explain, in part I, the United States immigration policy governing the treatment of Cuban refugees and how the Government implemented that policy in this case. Part II sets out the court’s holding that all of this is irrelevant. Part III explains why that holding is erroneous — that general criminal intent is the appropriate level of mens rea of the counts alleging a violation of § 1324(a)(2)(B)(ii). Part IV explains that, regardless of whether criminal intent is an element of the substantive offenses, Dominguez’s intent was relevant to his conspiracy charge given that the indictment, the Government’s requested jury instructions, and the district court’s instructions all required the jury to find that Dominguez acted “willfully.” Part V sets out additional reasons why, even assuming there is no criminal intent, the district court still erred. Part VI concludes.
I.
This part traces the origins of the Wet-Foot/Dry-Foot policy in light of established United States’ immigration policy toward Cubans.
A.
1.
The Immigration and Nationality Act (the “INA”), Pub.L. No. 82-414, 66 Stat. 168 (1952) (enacted as amended in scattered sections of 8 U.S.C.), declares, as a general rule, that an alien who arrives in the United States “at any time or place other than as designated by the Attorney General,”[10] or who lacks a “valid entry document,” is inadmissible and immediately removable.[11] In either case, a removable alien may apply for asylum as a refugee, 8 U.S.C. § 1158,[12] withholding of *1078 removal,[13] protection under the United Nations Convention Against Torture,[14] and admission into the United States. A refugee is:
any person who is outside any country of such person’s nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.
8 U.S.C. § 1101(a)(42)(A). If the alien “does not have a credible fear of persecution, the officer shall order the alien removed from the United States without further hearing or review,” 8 U.S.C. § 1225(b)(l)(B)(iii)(I), subject to the alien’s right under 8 U.S.C. § 1225(b)(l)(B)(iii)(III) to “request ... prompt review by an immigration judge.” If the asylum officer or immigration judge grants the alien’s application for asylum, the alien may be paroled pending final determination of his immigration status for “urgent humanitarian reasons or significant public benefit.” 8 U.S.C. § 1182(d)(5)(A).
Cuban aliens, however, occupy a unique position. A Cuban who arrives in the United States is presumed to be a refugee, and therefore entitled to asylum.[15] This presumption is based on the political and economic repression Cuban citizens have been suffering at the hands of the Castro government since it came to power in 1959. In the early years after Castro took over, the United States government welcomed Cuban refugees with open arms. Indeed, between 1965 and 1971, the United States government itself airlifted approximately two hundred-sixty thousand refugees out *1079 of Cuba and into the United States under the so-called “Freedom Flights” program.[16]
Political favor for Cuban refugees achieved official status in 1966, with the passage of the Cuban Adjustment Act (the “CAA”). That act granted special status to Cubans coming to the United States. It provided, in pertinent part,
the status of any alien who is a native or citizen of Cuba and who has been inspected and admitted or paroled into the United States subsequent to January 1, 1959 and has been physically present in the United States for at least two years, may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if the alien makes an application for such adjustment, and the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence.
Pub.L. No. 89-732, § 1, 80 Stat. 1161,1161 (1966).[17]
As explained by the House Judiciary Committee, in order to grant Cubans this special status, Congress had to except them from the prohibition then present within § 245(c) of the INA, which provided that “natives of any country of the Western Hemisphere, or of any adjacent island named in section 101(b)(5) of the Immigration and Nationality Act” were ordinarily “precluded from applying for adjustment to permanent resident status while in the United States.” H.R.Rep. No. 89-1978, at 1 (1966), reprinted in 1966 U.S.C.C.A.N. 3792, 3793. Congress separated Cubans from other natives of the Western Hemisphere because, as the House Judiciary Committee explained,
[t]he only recourse available to a refugee from Cuba under existing law in order to change to immigrant status is the awkward procedure of leaving the United States for an indefinite period of time in order to secure an immigrant visa at a U.S. consular office abroad and then reentering as a permanent resident.
H.R.Rep. No. 89-1978, at 2, 1966 U.S.C.C.A.N. at 3794.
In addition to avoiding this awkward procedure, the CAA would “aid in [Cuban refugees’] resettlement by enhancing their opportunity to qualify for employment in all areas of the Nation.” Id. Moreover, it would afford Cubans the same sort of opportunities that other immigrants might have: “The fact should not be overlooked that the beneficiaries of this legislation could have come to the United States as immigrants had diplomatic relations been maintained between the United States and Cuba.” Id.
Despite the existence of the CAA, the days of clear political preference for Cuban refugees would come to an end. The massive 1980 “boatlift” from the port of Mariel, Cuba, marked a new crisis point in the United States’s expressed policy of “open heart, open arms” towards Cuban refugees.[18] In the aftermath of a riot at the *1080 Peruvian Embassy in Havana, Castro announced that the port of Mariel was “open” to all who wanted to leave Cuba. Soon, American vessels were picking up refugees from Mariel and transporting them to United States shores. According to United States Coast Guard statistics, nearly one hundred twenty-five thousand Cubans fled to the United States in what became known as the “Freedom Flotilla.”[19]
2.
This set the stage for this court’s decision in United States v. Zayas-Morales, 685 F.2d 1272 (11th Cir.1982). ZayasMorales involved the prosecution of the owners and captains of American vessels, and those assisting them, who, as part of the Freedom Flotilla, picked up thousands of refugees from Mariel Harbor and brought them to Key West, Florida over the strong objection of the United States government. Id. at 1274. The ZayasMorales court described the Government’s objection:
The first group of aliens arrived in the United States on April 21, 1980. Two days later, the United States Coast Guard initiated warnings by means of radio broadcasts alerting all listeners to the possibility of arrests and seizure of vessels for transporting undocumented aliens to the United States. By that time many of the vessels had left the United States for Mariel Harbor. At approximately the same time, the United States Customs Service began issuing written notices requiring customs clearance prior to departure from United States ports and warning that transportation of undocumented aliens was illegal. Dissatisfied with the results of the initial efforts to halt the mass influx of aliens, on May 14, 1980, the President imposed an embargo on boats attempting to leave our territorial waters and ordered a return of United States vessels from Mariel Harbor. So ended the Freedom Flotilla.
685 F.2d at 1274 (citation omitted).
To indicate how condemnable it considered the defendants’ conduct, the Government indicted 386 of those involved in the Freedom Flotilla under 8 U.S.C. § 1324(a)(1), the predecessor to the version of the statute, 8 U.S.C. § 1324(a)(2), involved in this case. Id. at 1274. Section 1324(a)(1) stated, in pertinent part:
Any person, including the owner, operator, pilot, master, commanding officer, agent, or consignee of any 'means of transportation who—
(1) brings into or lands in the United States, by any means of transportation or otherwise, or attempts, by himself or though another, to bring into or land in the United States, by any means of transportation or otherwise;
any alien ... not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this chapter or any other law relating to the immigration or expulsion of aliens, shall be guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $2,000 or by imprisonment for *1081 a term not exceeding five years, or both, for each alien in respect to whom any violation of this subsection occurs.
Id. at 1274 n. 1 (quoting 8 U.S.C. § 1324(a)(1) (1976)).
The district court dismissed the indictment on the ground that the defendants did not commit a “crime in presenting the Cubans at the border checkpoint.”[20] We affirmed the dismissal on the ground that the Government failed to prove that the defendants acted with criminal intent, the mens rea element that the district court, at the Government’s urging, ruled irrelevant in Dominguez’s case.[21] Id. at 1273-74. The defendants lacked the requisite mens rea because they clearly intended to submit the aliens to proper immigration officials in full compliance with the law:
[N]ot only had the defendants presented the aliens to the proper officials, but ... their intention in doing so was to allow the aliens to seek legal status in this country.... Such an intention neutralizes any government theory that the defendants possessed the criminal intent necessary for a conviction under 8 U.S.C. § 1324(a)(1).
Id. at 1277.
The defendants’ lawful intent to retrieve Cubans without visas and deliver them to U.S. immigration officials was effective the moment the boats left Mariel Harbor and remained effective until delivery into the United States. See id. at 1274 (discussing stipulations made by the parties). Therefore, what the defendants intended to do with the aliens after their arrival in the United States was relevant to their intent to disobey the law. Id. at 1276-77.
3.
In light of several concerns arising, in part, out of our decision in Zayas-Morales, Congress revised § 1324 in 1986. I focus on those changes directly relevant to my disagreement with the court’s holding today — that evidence of the federal immigration policy governing the status of Cuban refugees and Dominguez’s reliance on that policy is irrelevant.
First, Congress split the “bring into” provision of § 1324(a)(1) into two separate provisions. The first provision, § 1324(a)(1)(A)®, makes it unlawful to bring an alien into the United States “at a place other than a designated port of entry.”[22] A person violating this provision may be sentenced to prison for not more than ten years for each alien brought to the United States at such place.[23] The *1082 second provision, § 1324(a)(2), makes it unlawful to bring any alien to the United States who has not received prior official authorization.[24] A comparison of the text of the old version of § 1324(a) with the text of the new version reveals that Congress added language to clarify that the new § 1324(a)(2) applies only to those individuals who act “knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come into, enter or reside, in the United States” and that a violation of § 1324(a)(2) can occur “regardless of any official action which may later be taken with respect to such alien.”
In drafting § 1324(a)(2), Congress created both a misdemeanor and a felony. The misdemeanor is punishable by a fine or imprisonment for not more than one year, or both;[25] and the felony, depending on the intent or purpose for which it was committed, is punishable by a fine and imprisonment for a maximum term of ten or fifteen years.[26] The presentence report prepared by the district court’s Probation Office for Dominguez’s case recommended imprisonment for a minimum term of three years and a maximum term of ten years for Counts 5, 6, 28, and 29 and a minimum term of five years and a maximum term of fifteen years for Counts 10, 13, 19, 33, 35 and 40.[27]
4.
Eight years after Congress revised 8 U.S.C. § 1324(a), the Wek-FooVDry-Foot policy emerged. The Clinton Administration sought to quell a new Cuban immigration crisis by entering into the Joint Communique of 1994 and the Joint Statement of 1995 (collectively, the “Migrant Accords”) with the Cuban government.[28] *1083 Signed on September 9, 1994, the Joint Communique provided that
migrants rescued at sea attempting to enter the United States will not be permitted to enter the United States, but instead will be taken to safe haven facilities outside the United States. Further, the United States has discontinued its practice of granting parole to all Cuban migrants who reach U.S. territory in irregular ways.
Cuba-United States: Joint Statement on Normalization of Migration, Building on the Agreement of September 9, 1994, 35 I.L.M. 327, 329.
In return, Cuba agreed to “prevent unsafe departures using mainly persuasive methods.” Id. The United States further committed “through other provisions of United States law, to authorize and facilitate additional lawful migration to the United States,” establishing that a “minimum of 20,000 Cubans each year” would be allowed to legally migrate. Id. at 330.
The Joint Statement, issued on May 2, 1995, declared that “Cuban migrants intercepted at sea by the United States and attempting to enter the United States will be taken to Cuba,” rather than Guantanamo Bay or, presumably, other safe havens as contemplated in the Joint Communique. Id. at 328. The Migrant Accords laid the foundation for what came to be known as the Wet-Foot/Dry-Foot policy, whereby those Cubans who arrived on United States soil could seek asylum, parole, and adjustment of status under the CAA, and those interdicted at sea would be returned to Cuba.
The specific contours of the Wet-Foot/ Dry-Foot policy were largely established by a series of decisions made by the Department of Justice’s Office of Legal Counsel and instructions issued by the INS and its successor agency, the United States Citizenship and Immigration Services (“USCIS”). On its own terms, the Joint Communique of 1994 would appear to cast doubt upon the ability of Cubans who entered the United States in “irregular ways” to gain parole or seek protection under the CAA. As the Communique states, “the United States has discontinued its practice of granting parole to all Cuban migrants who reach U.S. territory in irregular ways.” Id. at 329.
Deputy Attorney General Richard L. Shiffrin, however, stated in one key memorandum that the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (the “IIRIRA”), Pub.L. No. 104-208, div. C, 110 Stat. 3009-546 (codified as amended in scattered sections 8 U.S.C. and 18 U.S.C.), “substantially amended” the INA, changing the terms by which aliens could be denied legal process in the United States:
[T]he Reform Act has created the new category of “Aliens Treated as Applicants for Admission” under section 235 of the INA. An alien’s classification within that category will now determine whether he must receive inspection, screening, and other attendant procedures ... in contrast to aliens who may be summarily repulsed or returned without any INA screening and procedural requirements.
Memorandum from Richard L. Shiffrin, Deputy Assistant Att’y Gen., U.S. Dep’t. of Justice, to David A. Martin, Gen. Counsel, INS, Rights of Aliens Found in U.S. Internal Waters, 20 Op. O.L.C. 381, 381, 1996 WL 33101205, at *2 (1996) (emphasis in *1084 original) (citation omitted) [hereinafter the “Shiffrin Memorandum”].
Thus, while “aliens treated as applicants for admission” under the INA (as amended by the IIRIRA) include any
alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters)[.]
8 U.S.C. § 1225(a)(1) (2006), the Shiffrin Memorandum concluded that,
unlanded aliens interdicted on internal waters[29] do not constitute “applicants for admission,” and therefore need not be inspected or screened[. I]t necessarily follows that such aliens are not entitled to removal proceedings (i.e., the amended INA’s substitute for deportation proceedings) under section 240.[30]
1996 WL 33101205, at *3. The necessary implication of Shiffrin’s conclusion is that aliens found on land did constitute “applicants for admission” and were entitled to the attendant due process of law. Furthermore, while the United States might not grant automatic parole to all Cubans who reached United States territory irregularly, “as a practical matter, once a Cuban migrant is ‘feet dry,’ there is no place the United States Government can send the individual because, under the Migrant Accords, the Cuban Government will accept the repatriation of only those Cubans who [sic] the United States interdicts ‘at sea.’ ” Lieutenant Commander Brian W. Robinson, Smuggled Masses: The Need for a Maritime Alien Smuggling Law Enforcement Act, Army Law., Aug. 2010, at 20, 29.
If a Cuban who physically arrives in the United States — i.e., has “dry feet” — is thus to be treated as an “applicant for admission,” the question becomes one of the process he is due under United States law and policy. There was once a point of confusion among Immigration officers about the meaning of the word “admissible” in the language of the CAA quoted supra.[31] It appeared that Cubans who arrived in the United States at a place other than a designated Port-of-Entry could be inadmissible. This is because, under 8 U.S.C. § 1182(a)(6)(A)(i), “[a]n alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible.”
To ensure that Cubans would not be deprived of CAA adjustment on this ground, then — INS Commissioner Doris Meissner announced that the “policy of the [INS/USCIS] is that the inadmissibility ground that is based on an alien’s having arrived at a place other than a port-of-entry does not apply to CAA applicants.” Meissner Memorandum at 1 (emphasis in original). Otherwise, “the purpose of the CAA would have been defeated.” Id. at 2. Nonetheless, the Meissner Memorandum makes clear that this INS/USCIS “policy does not relieve the applicant of the obligation to meet all other eligibility requirements. In particular, [CAA] adjustment is available only to applicants who have been ‘inspected and admitted or paroled into the United States.’ ” Id. (citation omitted). A Cuban “present without inspection, there *1085 fore, would not be eligible for CAA adjustment unless the [Cuban] first surrendered himself ... into [INS/USCIS] custody and the [INS/USCIS] released the alien from custody pending a final determination of ... admissibility.” Id.
As Meissner noted, simply being “admissible” to the United States is not enough for a Cuban to qualify for adjustment of status under the CAA; the Cuban must, in the words of the CAA, also be “physically present in the United States” for at least one year.[32] CAA, Pub.L. No. 89-732, § 1, 80 Stat. at 1161. The expressed policy of the USCIS ensures that the dry-foot Cuban will have the opportunity to so remain in the United States:
A native or citizen of Cuba who is present in the United States without having been inspected and admitted is eligible to apply for an initial parole at the US-CIS field office having jurisdiction over the applicant’s place of residence. Natives or citizens of Cuba need parole documentation in order to become eligible for benefits under the Cuban Adjustment Act. ...
The validity period of the initial parole must be one (1) year. This will allow natives or citizens of Cuba who have been physically present in the United States for at least one year to apply for adjustment of status under the CAA and seek employment authorization as an applicant for permanent residence while the adjustment of status application is pending.
Memorandum from Tracy Renaud, Chief, Office of Field Operations, USCIS, to Field Leadership, File No. HQ 70/10.10, Processing of Initial Parole Requests Presented by Natives or Citizens of Cuba to USCIS Field Offices 1, 2 (Mar. 4, 2008), available at http://www.uscis.gov/files/ pressrelease/CubanParole_4Mar08.pdf (citation omitted).
As stated supra, parole is to be granted to an alien on the basis of “urgent humanitarian reasons” or a “significant public benefit.” 8 U.S.C. § 1182(d)(5)(A). While these standards may appear to be high ones, appearances may be deceiving. As the Meissner Memorandum explains, there exists a heavy presumption in favor of parole for Cuban refugees in the United States:
In the absence of a disqualifying criminal record or other factors that would bar CAA adjustment, however, the ongoing difficulty in actually removing aliens to Cuba and the availability of CAA adjustment should ordinarily weigh heavily in favor of a grant of parole. The [USCIS] may properly consider the avoidance of detention costs with respect to an alien whose actual removal is unlikely as a factor in determining, as a matter of discretion, that parole would yield “a significant public benefit.” In similar fashion, the [USCIS] may properly consider the availability of CAA adjustment as a factor in determining, as a matter of discretion, that an “urgent humanitarian reason” justifies a grant of parole.[33]
Meissner Memorandum 2-3 (citation omitted).
*1086 B.
Gustavo Dominguez is a native of Cuba and a naturalized United States citizen. At the time of the events that led to the indictment in this case, Dominguez was a sports agent. Through his company, Total Sports International (“TSI”), he had represented over 100 baseball players, many of whom played for Major League Baseball teams. This case involves five Cuban baseball players: Francisely Bueno-Trueba, Osbek Castillo-Perez, Allen Guevara-Perez, Osmany Masso-Arredondo, and Yoankis Turino-Montalno.
On August 22, 2004, they were brought from Cuba to the Florida Keys by boat and taken to the residence of a former Major League player, a Cuban national, in Miami. Dominguez was informed of the players’ arrival, agreed to represent the players, and arranged for their transportation to California.
Throughout this process, Dominguez retained the assistance of an experienced immigration law attorney. Shortly after the players arrived in California, Stephen Schneider, Dominguez’s TSI partner and a lawyer, arranged for Humberto Gray, an immigration attorney, to process the players through immigration.[34] Gray told Dominguez that he set up an appointment for the players at the USCIS Los Angeles office. On November 19th, Gray and Dominguez accompanied the players to the USCIS office to apply for asylum and “to get their paroles.” They were paroled. Gray thereafter represented them before the USCIS.
Because the players were presumptive refugees, all of this happened precisely as set out by the CAA, the Wefc-Foot/DryFoot policy, and the Meissner Memorandum; to wit, the Cuban aliens arrived in the United States at a location other than a designated port of entry, made their way to immigration authorities, and were then paroled. These events, however, gave rise to the current prosecution for conspiracy to smuggle, attempted smuggling, smuggling in violation of 18 U.S.C. § 371 and 8 U.S.C. § 1324(a)(2)(B)(ii); transporting aliens, in violation of 8 U.S.C. § 1324(a)(l)(A)(ii); and harboring aliens, in violation of 8 U.S.C. § 1324(a)(l)(A)(iii).
C.
Anticipating that Dominguez would frame a defense to those charges based on “Legislative and Executive Branch immigration policies” that apply specifically to Cubans, namely the CAA, the Wefr-Foot/ Dry-Foot policy, and the Meissner Memorandum, the Government moved the district court in limine to bar Dominguez from referring to these policies in the presence of the jury at trial. In response, Dominguez argued that, if these policies did not preclude his conviction, they were at least relevant to the mens rea element of the charged offenses.
According to Dominguez, the policies the Government sought to exclude enable undocumented Cubans who enter the United *1087 States at a location not designated as a “Port-of-Entry” by the Attorney General and without valid entry documents to apply for permanent residence status. Dominguez represented that he was aware of these policies when he had the five players transported to California, trained, observed by Major League baseball scouts, and presented to the federal immigration authorities. In this light, he contended, he lacked the requisite criminal intent to violate the law.
The district court granted the Government’s motion.[35] The court rejected the notion that the Web-Foot/Dry-Foot policy and the CAA provided a legal defense to any of the pending charges against Dominguez, holding that the policy and the CAA were “irrelevant” for such purpose. As for Dominguez’s mens rea argument, the court held that Dominguez’s beliefs about the law were “irrelevant to his intent” to violate 18 U.S.C. § 371 and 8 U.S.C. § 1324(a)(2)(B)(ii). The court explained: “[t]he mens rea presumption requires knowledge only of the facts that make the defendant’s conduct illegal, lest it conflict with the related presumption, deeply rooted in the American legal system, that, ordinarily, ignorance of the law or a mistake of law is no defense to criminal prosecution.” Order Granting Gov’t Mot. In Limine 2, Mar. 14, 2007 (quoting Staples v. United States, 511 U.S. 600, 622 n. 3, 114 S.Ct. 1793, 1805 n. 3, 128 L.Ed.2d 608 (1994) (Ginsburg, J., concurring in the judgment) (citation and internal quotation marks omitted)). As such, the court implicitly found that Dominguez’s knowledge of the CAA and the Wet-Foot/Dry-Foot policy was not relevant to his culpability.
The district court’s order governed the conduct of Dominguez’s trial. That is, the order precluded Dominguez from (1) testifying that he arranged to have the players brought to California for what he thought was a lawful purpose, to enable them to attain asylum and parole in conformance with the immigration policy established by the CAA, Web-Foot/Dry-Foot policy, and Meissner Memorandum; and (2) presenting the expert testimony of a retired Immigration Judge to explain that immigration policy. The jury received the case without hearing a word about the policy from the witness stand or the court’s instructions on the law. Moreover, the instructions the court actually did give on the elements of the smuggling offenses did not contain an instruction on criminal intent.[36]
II.
I now turn to the court’s affirmance of the district court’s treatment of the mens rea defense Dominguez attempted to present in countering the charges that he conspired to violate and violated 8 U.S.C. § 1324(a)(2)(B)(ii). The court first recites the language of § 1324(a)(2),[37] noting that a defendant must know or recklessly disregard “the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States” and that a smuggling offense occurs “regardless of any official action which may later be taken with respect to such alien,” so long as the defendant brings or attempts to bring the alien to the United *1088 States. Ante at 1067. The court highlights the mens rea requirement for the first element, that the defendant know or recklessly disregard the alien’s status, and points out that Congress omitted any mens rea for the second element of the offense. Ante. Then, the court notes that there is a presumption that each statutory element contains some level of scienter. Ante. The court concludes that:
[A] court may treat the mens rea Congress provided in the statute as modifying each element that follows it. Thus, we decide a defendant must knowingly bring an alien to the United States.
Ante (emphasis added).[38]
To support its conclusion that the statutory language it highlighted rendered Dominguez’s criminal intent irrelevant, the court points to the legislative history of the revisions Congress made to the statute in the wake of Zayas-Morales, finding that the legislative history explains that Congress intended to overrule Zayas-Morales and “expand the scope of activities proscribed by federal law to reach the conduct of those participating in such operations as the Mariel boatlift.” Ante at 1070.
The court also highlights the opinions from three cases to establish that Congress intended to omit criminal intent as an element of the § 1324(a)(2)(B)(ii) offense. Ante at 1068. First, the court cites United States v. Mussaleen, 35 F.3d 692, 698 (2d Cir.1994), for the proposition that “reckless disregard” or knowledge can satisfy the requirement of a mens rea element. Ante at 1068. The challenge raised in that ease, however, focused on whether “reckless disregard” could be a sufficient mens rea, or whether actual knowledge was necessary. Mussaleen, 35 F.3d at 698. I do not question that a defendant who acts in reckless disregard of an alien’s status can be convicted under the statute; rather, the central issue is whether the Government must also prove criminal intent for the second element. Thus, Mussaleen addressed a different concern than at what is issue here.
Second, the court discusses United States v. Nguyen, 73 F.3d 887 (9th Cir.1995). Ante at 1069-70. In Nguyen, the court found that 8 U.S.C. § 1324(a)(1), a felony, requires proof of criminal intent— although the statutory language did not expressly require it — but questioned, in dicta, whether the misdemeanor provision of § 1324(a)(2) required the same proof. 73 F.3d at 892-93. Here, we deal with the felony provision.
Finally, the court points to a concurring opinion in United States v. Garcia-Cordero, 610 F.3d 613, 619 (11th Cir.2010) (For-man, J., concurring). Ante at 1070. In Garcia-Cordero, the concurring opinion contains this comment: “Consequently, Congress enacted 8 U.S.C. § 1324(a)(2)[B], which does not require general criminal intent, to make it a misdemeanor to engage in conduct of the kind at issue in the Mariel Freedom Flotilla cases.” 610 F.3d at 619 (Forman, J., concurring) (emphasis added). Notably, the concurring opinion cites no case in support of the above-quoted proposition.
In sum, no opinion cited by the court states that criminal intent is not an element of the § 1324(a)(2)(B) felony offenses.
III.
I must respectfully disagree with the court’s reasoning and conclusion that the *1089 § 1324(a)(2)(B) felony offenses do not require proof of criminal intent. In the simplest terms, the court today creates a circuit split on this issue. In doing so, it rejects the reasoned analysis of our sister circuits that have analyzed this- provision and the nearly identical language found in the § 1324(a)(1) felony offenses. For the reasons set forth below, I do not read the statute to eliminate a general criminal intent mens rea, but instead conclude that proof of general criminal intent is an element of the § 1324(a)(2)(B) felony offenses.[39]
A.
1.
The analysis of the mens rea issue appropriately begins with the language of the statute, 8 U.S.C. § 1324(a)(2)(B). See Staples v. United States, 511 U.S. 600, 605, 114 S.Ct. 1793, 1797, 128 L.Ed.2d 608 (1994). The challenge the court faces here is that the language provides little guidanee; without question, Congress did not expressly eliminate the mens rea requirement. Rather, the language of the statute merely makes it unlawful for a person who,
knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to the United States in any manner whatsoever, such alien regardless of any official action which may later be taken with respect to such alien.
8 U.S.C. § 1324(a)(2).
Considered in light of legislative history, the court concludes that Congress intended to omit criminal intent as an element of the § 1324(a)(2)(B)(ii) offenses.[40] Ante at 1070. The court’s analysis, however, reaches its mens rea holding without considering the “interpretative presumption” that proof of criminal intent or in other words, an evil mind, is required to convict a defendant of a crime, such as smuggling, *1090 which has its origin in the common law,[41] United States v. U.S. Gypsum Co., 438 U.S. 422, 437, 98 S.Ct. 2864, 2873, 57 L.Ed.2d 854 (1978) (“Although Blackstone’s requisite “vicious will” has been replaced by more sophisticated and less colorful characterizations of the mental state required to support criminality intent generally remains an indispensable element of a criminal offense.” (internal citation omitted)),[42] for each element of the offense, United States v. X-Citement Video, Inc., 513 U.S. 64, 72, 115 S.Ct. 464, 469, 130 L.Ed.2d 372 (1994) (“[Supreme Court precedent] instructs that the presumption in favor of a scienter requirement should apply to each of the statutory elements that criminalize otherwise innocent conduct.”). The presumption articulated by the U.S. Gypsum Court draws from the Court’s earlier decisions in Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952),[43] and Dennis v. United States, 341 U.S. 494, 500, 71 S.Ct. 857, 862, 95 L.Ed. 1137 (1951).[44]
In Dennis, decided a year before Morissette, the Court observed that “[t]he existence of a mens rea is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence.” 341 U.S. at 500, 71 S.Ct. 857, 862. In Morissette, the Court explained the origin of the judiciary’s practice of finding legislative intent to include criminal intent as a requirement for a felony conviction, even where the statute was silent as to the requirement. The Court in Morissette noted:
As the states codified the common law of crimes, even if their enactments were silent on the subject, their courts assumed that the omission did not signify disapproval of the principle but merely recognized that intent was so inherent in the idea of the offense that it required no statutory affirmation. Courts, with little hesitation or division, found an implication of the requirement as to offenses that were taken over from the common law.
342 U.S. at 252, 72 S.Ct. at 244.
The Court tacitly, if not expressly, approved this practice again in 1985 in Lipa *1091 rota v. United States, reiterating the fundamental principle that criminal offenses without a mens rea element are “generally disfavored.” 471 U.S. 419, 426, 105 S.Ct. 2084, 2088, 85 L.Ed.2d 434 (1985). In sum, “far more than the simple omission of the appropriate phrase from the statutory definition is necessary to justify dispensing with an intent requirement.” U.S. Gypsum, 438 U.S. at 438, 98 S.Ct. at 2874. That is, more than a “simple omission” is necessary to rebut the interpretative presumption that proof of criminal intent is required for a felony conviction. As I will explain, there is nothing in the text or the legislative history that is sufficient to rebut that presumption for § 1324(a)(2)(B).
2.
Congress did not overcome this presumption for three reasons: (1) the text and legislative history are not sufficiently clear to infer any implied intent to eliminate criminal intent, (2) the specific language Congress chose to use in the 1986 revision mirrors language that courts have overwhelmingly held to include a criminal intent mens rea, and (3) the potential penalties imposed for a violation under this provision are severe enough to indicate that Congress intended to retain the requirement to show proof of criminal intent.
First, the statutory language itself is unclear, as Congress simply omitted any mens rea element in reference to the “brings to or attempts to bring to” element. Also, nothing in the legislative history is clear enough to overcome the presumption that criminal intent is an element under § 1324(a)(2)(B). The court essentially hinges its interpretation of the statute on one portion of the legislative history. Ante at 1068-71. After reviewing the holdings of the district court in United States v. Anaya, 509 F.Supp. 289 (S.D.Fla. 1980), aff’d on other grounds sub nom. United States v. Zayas-Morales, 685 F.2d 1272 (11th Cir.1982), and Zayas-Morales, the House committee stated:
The Committee is convinced that this gap in current law must be closed. Without the threat of criminal prosecution, there is no effective way to deter potential transporters from inundating U.S. ports of entry with undocumented aliens. As happened during the Mariel episode, the United States would be forced to expend extraordinary amounts of money and human resources in processing, monitoring, caring for and giving hearings to exorbitant numbers of people.
H.R.Rep. No. 99-682(1) at 20 (1986), reprinted in 1986 U.S.C.C.A.N. 5649, 5670.
I am not convinced that Congress authorized the courts to read the statute as eliminating proof of an evil mind for a felony conviction under § 1324(a)(2)(B).[45] The unexplained “gap” referred to in the legislative history is ambiguous at best. While I do not doubt that the statutory revisions made in 1986 were intended to “expand the scope of activities proscribed,” 1986 U.S.C.C.A.N. at 5670, the “gap” could focus on any number of issues raised by the decisions of the district court and this court.[46] This bare assertion alone is not *1092 sufficient. My reading of the statute is in accord with the other courts who have interpreted the legislative history. See part III.A.3, infra.
Second, § 1324(a)(2)(B) should be read as requiring a criminal intent mens rea element because Congress intentionally chose to use language in the 1986 revisions that federal courts have consistently interpreted to include criminal intent. The Supreme Court has held that “Congress will be presumed to have legislated against the background of our traditional legal concepts which render intent a critical factor,” and “absence of contrary direction [will] be taken as satisfaction with widely accepted definitions, not as a departure from them.” U.S. Gypsum, 438 U.S. at 437, 98 S.Ct. at 2873 (alteration in original) (quoting Morissette, 342 U.S. at 263, 72 S.Ct. at 250).
The Supreme Court’s decision in Liparota, is one illustration of this point.[47] Liparota involved a “food stamps” prosecution. The defendant was charged with acquiring and possessing food stamps in violation of 7 U.S.C. § 2024(b)(1). That section provided at the time and in relevant part: “[W]hoever knowingly uses, transfers, acquires, alters, or possesses coupons ... in any manner not authorized by this Act or the regulations issued pursuant to this Act[.]” 7 U.S.C. § 2024(b) (1981).
The Government’s case consisted of the testimony of an undercover agent of the Department of Agriculture who had gone to the defendant’s sandwich shop and, on three occasions, had purchased a total of $1,195 of food stamps for $800. The defendant argued that this testimony, standing alone, was insufficient to establish that he had violated § 2024(b)(1); he argued that the Government had to prove that he knew he was violating a federal law when he purchased the food stamps. The district court disagreed and instructed the jury that,
the Government had to prove that the Defendant acquired and possessed food stamp coupons for cash in a manner not authorized by federal statute or regulations and that the Defendant knowingly and wilfully (sic) acquired the food stamps.
Liparota, 471 U.S. at 422, 105 S.Ct. at 2086 (internal quotations omitted).[48]
The defendant was convicted, and, on appeal, the Seventh Circuit affirmed. Id. The Supreme Court granted certiorari to determine “whether in a prosecution under *1093 [§ 2024(b)(1) ] the Government must prove that the defendant knew that he was acting in a manner not authorized by statute or regulations.” Id. at 420-21,105 S.Ct. at 2086. The answer was a matter of statutory interpretation, and the Court, disagreeing with the Government, held that such knowledge was an element of the offense. In a § 2024(b)(1) prosecution, the Court concluded that the jury must be informed of what the statute and regulations proscribe, then instructed to determine whether the defendant knew that his conduct was unlawful. Id. The Court elaborated on its holding:
[T]he Government must prove that the defendant knew that his acquisition or possession of food stamps was in a manner unauthorized by statute or regulations. This holding does not put an unduly heavy burden on the Government in prosecuting violators of § 2024(b)(1). To prove that petitioner knew that his acquisition or possession of food stamps was unauthorized, for example, the Government need not show that he had knowledge of specific regulations governing food stamp acquisition or possession. Nor must the Government introduce any extraordinary evidence that would conclusively demonstrate petitioner’s state of mind. Rather, as in any other criminal prosecution requiring mens rea, the Government may prove by reference to facts and circumstances surrounding the ease that petitioner knew that his conduct was unauthorized or illegal.
Id. at 433-34, 105 S.Ct. at 2092-93 (footnote omitted).
Moreover, several of our sister circuits have read this type of statutory language and structure to include “willfully” to modify the verb in § 1324 offenses, rather than applying, as the court does here, the “knowing” mens rea that is applicable only to the first element of the offense. For example, in United States v. Parmelee, 42 F.3d 387 (7th Cir.1994), the Seventh Circuit concluded that the predecessor to § 1324(a)(l)(A)(ii) required that an element of criminal intent — that the defendant act willfully — be read into the statute.[49] See id. at 390. The Parmelee court reached this conclusion because to hold otherwise would lead to “sweeping liability.” Id. at 39. Numerous other circuits follow the same approach to read in “willfully” as an element, rather than requiring only that the defendant act “knowingly.” See United States v. Chavez-Palacios, 30 F.3d 1290, 1294 (10th Cir.1994) (holding that there is a “willful” mens rea element required under statute with identical language to current § 1324(a)(l)(A)(ii)); United States v. Diaz, 936 F.2d 786, 788 (5th Cir.1991) (reading in “willful” mens rea for the transporting provision that is now in § 1324(a)(l)(A)(ii)); United States v. Medina-Garcia, 918 F.2d 4, 7 (1st Cir.1990) (addressing mens rea for transporting provision now in § 1324(a)(l)(A)(n), which requires that the defendant acted “willfully”); United States v. Hernandez, 913 F.2d 568, 569 (8th Cir.1990) (per curiam) (interpreting § 1324(a)(l)(A)(ii) to find that the defendant acted “willfully in furtherance” of alien’s violation of the law was a required element); United States v. 1982 Ford Pick-Up, 873 F.2d 947, 951 (6th Cir.1989) (concluding that the Government *1094 must prove “the defendant willfully transported an illegal alien” under § 1324(a)(l)(A)(ii)); United States v. Morales-Rosales, 838 F.2d 1359, 1360 (5th Cir.1988) (holding that Government must prove that defendant acted “willfully” to prove a violation of the transporting provision), overruled on other grounds by United States v. Longoria, 298 F.3d 367 (5th Cir.2002); United States v. Merkt, 764 F.2d 266, 272 (5th Cir.1985) (affirming a jury instruction that included a “willful” element for the transporting violation). But see United States v. De Jesus-Batres, 410 F.3d 154, 162 (5th Cir.2005) (rejecting Nguyen while interpreting the harboring provision in § 1324(a) (1) (A) (iii), but offering no explanation other than “[tjhis circuit follows a different rule and has held, as to similar offenses, that proof of specific intent to violate immigration laws is not required.”). That other circuits have interpreted provisions with the same language and structure to include a “willful” element is instructive to the approach we should take in interpreting this provision. Namely, it is highly persuasive that other courts have consistently rejected the interpretation suggested by the court today— that we should read “knowingly” to apply to each element — and instead concluded that criminal intent is the proper mens rea.
Thus, it is fair to conclude that when Congress chose the particular language of § 1324(a)(2)(B), it did so with full knowledge of the widespread practice to interpret such language to include a criminal intent element.[50] See Morissette, 342 U.S. at 252, 72 S.Ct. at 244. Congress could have expressly indicated that a general criminal intent mens rea element was not required for the “bring” or “attempts to bring” element in a § 1324(a)(2)(B) prosecution; instead, it left a blank slate for us to interpret. This omission does not establish that Congress intended to eliminate criminal intent.
Finally, a third factor that weighs in favor of reading a criminal intent element into § 1324(a)(2)(B) is that Congress prescribed harsh penalties for its violation. The Supreme Court has held that the severity of potential punishment is a major factor in finding whether Congress intended to omit an evil-mind requirement. See Staples, 511 U.S. at 616, 114 S.Ct. at 1802 (“Historically, the penalty imposed under a statute has been a significant consideration in determining whether the statute should be construed as dispensing with mens rea.”); see also Morissette, 342 U.S. at 256, 72 S.Ct. at 246 (noting that in statutes without a mens rea, the “penalties commonly are relatively small, and conviction does no grave damage to an offender’s reputation.”). The imposition of significant penalties without any requirement of criminal intent is “incongruous.” Staples, 511 U.S. at 617, 114 S.Ct. at 1803.
The severity of the penalties authorized under § 1324(a)(2)(B) clearly indicates that Congress intended a mens rea element. Section 1324(a)(2)(B)(ii), addressing an “offense done for the purpose of commercial advantage or private financial gain,” authorizes imprisonment for a first- or second-time violation of “not less than 3 nor more than 10 years,” and “not less than 5 nor more than 15 years” for subsequent *1095 violations. See § 1324(a)(2)(B)(ii).[51] These penalties are a far cry from the petty punishments, such as a fine or short jail sentence, typically associated with a crime that does not require mens rea. See Staples, 511 U.S. at 616, 114 S.Ct. at 1803 (“Certainly, the cases that first defined the concept of the public welfare offense almost uniformly involved statutes that provided for only light penalties such as fines or short jail sentences, not imprisonment in the state penitentiary.”); see also Commonwealth v. Raymond, 97 Mass. 567 (1867) (involving a fine of up to $200 or six months in jail, or both); Commonwealth v. Farren, 91 Mass. 489 (1864) (discussing a penalty limited to a fine); People v. Snowburger, 113 Mich. 86, 71 N.W. 497 (1897) (addressing penalties of only a fine of up to $500 or incarceration in county jail).
Here, Congress authorized more severe punishments under § 1324(a)(2)(B) than it did for violations under the current version of § 1324(a)(1)(A) and the version of § 1324(a)(1) that existed in Zayas-Morales.[52] In Nguyen, one of the cases the court cites, ante at 1069-70, the Ninth Circuit’s holding depended in part on the severity of the penalties for violating § 1324(a)(1)(A). Nguyen, 73 F.3d at 892. In many ways, there is a more persuasive argument that Congress intended an element of criminal intent in § 1324(a)(2)(B) given that the mandatory minimum prison sentence of three or five years and the maximum sentence of ten or fifteen years creates a more punitive scheme than the one in § 1324(a)(1)(A).[53]
In short, the greater the penalty, the more Congress is aware that, if it intends to eliminate criminal intent, it must do so clearly. If the district court decided to run Dominguez’s sentences consecutively, the total sentence could have been as low as forty-seven years and as high as one hundred thirty-five years.[54] The potential penalty authorized by Congress under § 1324(a)(2)(B)(ii) is great indeed. There is nothing in the language of § 1324(a)(2)(B)®,(ii), or (iii) or the legisla *1096 tive history indicating a legislative intent to omit criminal intent as an element of the offenses, let alone a clear statement one would expect given the severe penalties authorized. Thus, the penalties the statute imposes weigh heavily in favor of a finding that Congress intended that general criminal intent remain an element.
Finally, I note that in instances where there is ambiguity concerning the scope of a criminal statute, courts traditionally apply the longstanding rule of lenity. See Barajas-Montiel, 185 F.3d at 952-53 (“If after examining the statutory language and the legislative history we perceive any ambiguity regarding Congress’s intent to require a showing of criminal intent, we will resolve the ambiguity by implying a mens rea element.” (quoting Nguyen, 73 F.3d at 890-91)). Even absent the reasons why I conclude that mens rea is an element of the § 1324(a)(2) offenses, at a bare minimum, the considerable ambiguity as to the inclusion of that element counsels that we apply the rule of lenity. See U.S. Gypsum, 438 U.S. at 437, 98 S.Ct. at 2873; see also Liparota, 471 U.S. at 427, 105 S.Ct. at 2089 (“Application of the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability.”); United States v. Bass, 404 U.S. 336, 348, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971) (“[B]ecause of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity.”).
3.
The approach I endorse is confirmed by a clear majority of circuits that have considered whether criminal intent is an element of the §§ 1324(a)(1) and 1324(a)(2) offenses.[55] My research reveals that only the Ninth Circuit has answered the question regarding the § 1324(a)(2) offenses. Other courts have addressed the question regarding the § 1324(a)(1) offenses; as a whole, their holdings support my interpretation.
The Ninth Circuit in Barajas-Montiel confronted the § 1324(a)(2)(B) issue and concluded that criminal intent is an element of the offense. Barajas-Montiel, 185 F.3d at 952. In that case, the court drew on its decision in Nguyen, see id. (reviewing the text and legislative history of § 1324 to conclude that there was insufficient proof Congress intended to dispose of the mens rea requirement for common law offenses, noting that “[cjertainly there is nothing in the legislative history suggesting a desire to do so.” (quoting Ngu *1097 yen, 73 F.3d at 893)), and held that the reasoning of Nguyen applies with equal force to § 1324(a)(2)(B). Barajas-Montiel, 185 F.3d at 953. In so holding, the court emphasized the lack of clarity in the legislative history, the similarity between offenses under § 1324(a)(1) and the felony provisions of § 1324(a)(2)(B), and the potential for harsh penalties. Id. at 952-53 (“Without a specific intent instruction, the jury does not have to consider whether a defendant intended to violate immigration laws, and therefore the jury could conceivably believe that they had to convict ... where the defendant ... had plausible claims that he nevertheless lacked the intent to violate the law.”).
Although not precisely on point, other circuits have almost uniformly interpreted other § 1324(a)(1) provisions by reading in an element of criminal intent. As noted above, the Ninth Circuit has held that the § 1324(a)(l)(A)(i) “bringing in” felony offense includes an element of criminal intent. See Nguyen, 73 F.3d at 894 (reading in mens rea for § 1324(a)(1)(A)©). Similarly, the First, Fifth, Sixth, Seventh, Eighth, Ninth, and Tenth Circuits have read in criminal intent for the § 1324(a)(l)(A)(ii) transporting offense. See Parmelee, 42 F.3d at 390; ChavezPalacios, 30 F.3d at 1294 (holding that there is a mens rea element required under § 1324(a)(l)(A)(ii)); Diaz, 936 F.2d at 788 (reading in mens rea for transporting offense now in § 1324(a)(l)(A)(ii)); Medinar-Garcia, 918 F.2d at 7-8 (addressing mens rea for transporting offense now in § 1324(a)(l)(A)(ii)); Hernandez, 913 F.2d at 569 (per curiam) (interpreting § 1324(a)(1)(A)©)); 1982 Ford Pick-Up, 873 F.2d at 951 (concluding that the Government must prove “that the defendant willfully transported an illegal alien with the specific intent of supporting the alien’s illegal presence” under § 1324(a)(1)(A)©)); Morales-Rosales, 838 F.2d at 1360 (discussing mens rea for transporting offense). In addition, the Ninth Circuit has also held that criminal intent is a required element for the § 1324(a)(l)(A)(iii) harboring offense. See United States v. Chang Guo You, 382 F.3d 958, 966 (9th Cir.2004) (“The court instructed the jury that it must find that Appellants had acted with ‘the purpose of avoiding [the aliens’] detection by immigration authorities.’ This instruction is synonymous with having acted with necessary intent as required in Barajas-Montiel and Nguyen.”) (emphasis and alteration in original).
B.
Applying the tools courts use in determining whether a criminal statute requires criminal intent and considering the decision-making reflected in the case law, I am lead to the conclusion that § 1324(a)(2)(B) must contain an element of criminal intent. The court, however, arrives at a different conclusion, believing instead that to require proof of criminal intent is contrary to the plain language and legislative history of the statute and functionally eliminates the “reckless disregard” language. Ante at 1068. While initially appealing, the court’s analysis withers under close scrutiny.
As an initial matter, the statutory language is silent as to what the requisite mens rea is for the “bring” or “attempt to bring” element; we cannot merely read the “plain language” of the statute because Congress omitted any mens rea for the second element entirely. The question is not how to define the phrase “knowingly or in reckless disregard” but rather, in the absence of any mens rea for the second element, should we merely require proof of knowledge or should we require proof that the alleged smuggler acted with an evil *1098 mind, i.e., that the Government show proof of general criminal intent?
The mens rea established by Congress for the first element is “knowingly or in reckless disregard.” The court, on the other hand, would read in “knowing” to the second element of § 1324(a)(2), but would discard the “or in reckless disregard” language; without question, the court does not merely apply the mens rea Congress chose in an even-handed manner to each element of the statute. To read in one level of mens rea — knowing—yet omitting the second level of mens rea — in reckless disregard — when considering the second element of the offense is hardly adhering to the “plain language” of Congress. In fact, it is fair to say that the court’s reading does far more to “functionally eliminate” the “or in reckless disregard” language than does my interpretation. And the legislative history is equally unclear for the reasons mentioned supra.
Instead we are left to conduct a full analysis, using the tools described by Supreme Court precedent, to determine whether Congress made a showing sufficient to overcome the presumption of criminal intent. After considering the text, structure, and penalties authorized for felony offenses under § 1324(a)(2), the answer is clear — Congress did not eliminate criminal intent from the § 1324(a)(2) felony offenses, or at a bare minimum, the issue is sufficiently unclear such that the interpretive presumption cannot be rebutted.
Moreover, for proof that my interpretation would not lead to the results claimed by the court, we need look no further than the numerous decisions of our sister circuits. These decisions are persuasive regardless of whether they interpret § 1324(a)(1) or § 1324(a)(2) because the same structure and language is present in both provisions; to wit, both sections contain the “knowing or in reckless disregard” introduction relating to the status of the alien, followed by some verb that does not contain any explicit mens rea element specified by the statutory language.[56] When evaluating any of these provisions, courts are faced with the question of adopting an approach similar to the one taken by the court today, applying the “knowing or in reckless disregard” to each element, or to follow the approach I advocate.
Because the language and structure found in § 1324(a)(1) and § 1324(a)(2) is virtually identical, how our sister circuits answered this question of statutory interpretation is highly persuasive, and yet largely ignored by the court’s opinion. In short, three important lessons are readily apparent after comparing the approach *1099 taken by our sister circuits with the approach adopted by the court today: first, the court’s approach to the interpretation of § 1324 is the first of its kind — -none of the courts cited in the court’s opinion or my opinion that have addressed this issue applied the “knowing or in reckless disregard” mens rea to each element; second, a clear majority of courts have concluded, as I do, that Congress intended that criminal intent remain an essential element, as these courts read in “willfully” to apply to the second element — modifying the verb— in this statute; and third, for over twenty years courts have read this type of statute to include “knowing or in reckless disregard” as the mens rea for the alien’s status and “willful” as the mens rea for the defendant’s act (bringing, transporting, or harboring) without impacting, much less functionally eliminating, any other language in the statute.
Quite simply, for the reasons discussed supra, neither the text of the statute nor the legislative history indicates that Congress intended to do away with the requirement that a defendant act with an evil mind. That smuggling was a crime at common law, that Congress deliberately chose to use a statutory structure and language that courts have traditionally read to include a criminal intent element, and that Congress prescribed imprisonment for up to fifteen years for a violation are all strong indications that some criminal intent requirement must be read in to the statute. If, by chance, any question remains as to Congress’s intent, the rule of lenity requires that we construe the statute to include an evil-mind element.
Accordingly, I respectfully disagree with the court’s holding that proof of criminal intent is not required for § 1324(a)(2)(B) offenses. Like our decision in ZayasMorales and the decisions of our sister circuits, I would hold that in addition to proving that Dominguez knew or acted in reckless disregard of the fact that the players had not received receive prior official authorization to enter, the Government had to prove that Dominguez acted with general criminal intent. In other words, that he acted “willfully.”
C.
Assuming that criminal intent is an element of the § 1324(a)(2)(B)(ii) offense, the district court erred in prohibiting Dominguez from going forward with his defense that he lacked the criminal intent necessary for conviction. The prohibition was sweeping: the jury was not to hear a word about the CAA, Wet-Foot/Dry-Foot policy, the Meissner Memorandum, whether it would come from Dominguez’s testimony or the testimony of the retired Immigration Judge Dominguez attempted to call as an expert witness to explain the operation of the Government’s immigration policy as it related to Cuban refugees.[57] True, Dominguez was able to testify on redirect examination that Cubans are entitled to stay in the United States “regardless of how they got to the United States,” but only because the prosecutor, on cross-examination, opened the door. Dominguez’s statement fell on deaf ears; the court’s prohibition prevented Dominguez from testifying at length about how the immigration authorities handle dry-foot Cubans and from buttressing his testimony with that of the retired Immigration Judge he proffered.
In instructing the jury at the close of the case, the district court rejected Domin *1100 guez’s requested mens rea instructions.[58] Dominguez’s Theory of Defense Instruction No. 2 read:
It is the defense in this ease that Gustavo “Gus” Dominguez did not intentionally engage in illegal alien smuggling or attempt to illegally smuggle aliens, and that he did not illegally transport aliens or harbor illegal. At all times, Gus Dominguez was a legitimate Major League Baseball player agent who acted lawfully and in the best interests of his clients.
I instruct you that if you find Defendant Dominguez in fact did not intentionally engage in smuggling, transporting, or harboring illegal aliens, you may consider this as evidence of the lack of criminal intent by Defendant Dominguez.
(emphasis added). The court sustained the Government’s objection to Instruction No. 2, and gave the following instruction, instead:
It is Gustavo “Gus” Dominguez’s theory of the case that he never entered or intended to enter into any conspiracy to bring aliens into the United States illegally, to transport illegal aliens within the United States, or to harbor illegal aliens in the United States, nor did he knowingly engage in illegal alien smuggling or attempt to illegally smuggle aliens, and that the did not illegally transport aliens or harbor aliens,
(emphasis added). The instruction was wrong because, for the reasons I state in part III.A., supra, the Government needed to show that Dominguez acted willfully, with the general criminal intent to disobey the law. To find that Dominguez willfully engaged in illegal smuggling, the jury had to be fully informed as to his state of mind. They were not informed because the district court barred the information on which Dominguez acted. That Dominguez honestly believed that he was acting lawfully, in reliance on official pronouncements such as the Meissner Memorandum, and that he intended to present the Cubans to immigration authorities makes this case identical to that in Zayas-Morales; in Dominguez’s case as in Zayas-Morales, the defendant’s state of mind is critical.[59]
In sum, the district court committed reversible error in failing to instruct the jury that criminal intent was an element of the § 1324(a)(2)(B)(ii) offenses and from precluding the jury from hearing about the CAA, the Wet-Foot/Dry-Foot policy, the Meissner Memorandum, and, from Dominguez’s proffered Immigration Judge, the Government’s implementation of that policy. These errors require reversal of the conspiracy, attempt, and smuggling convictions.
*1101 IV.
Even if the court somehow concluded general criminal intent is not an element of § 1324(a)(2)(B)(ii), all of the above-discussed evidence was, at a minimum, relevant to the conspiracy charge under Count 1. The indictment prepared by the Government, the Government’s requested jury instructions, and the district court’s actual instructions to the jury required the jury to find that Dominguez acted “willfully,” thereby squarely putting Dominguez’s intent at issue. Thus, the district court erred in excluding the CAA, the Meissner Memorandum, the Wet-Foot/Dry-Foot policy, and the testimony from the Immigration Judge.
Dominguez’s intent was at issue for the Count 1 conspiracy charge under 18 U.S.C. § 371, for conspiring to violate the transporting, harboring, and smuggling provisions of Title 8. The grand jury, when it indicted Dominguez, alleged that Dominguez “did knowingly and willfully combine, conspire, confederate, and agree with other persons known and unknown to the Grand Jury, to commit offenses against the United States.” What’s more, the Government requested the following jury instructions for the conspiracy count:
First: That two or more persons in some way or manner, came to a mutual understanding to try to accomplish a common and unlawful plan, as charged in the indictment; and
Second: That the Defendant, knowing the unlawful purpose of the plan, willfully joined in it;
Third: That one of the conspirators during the existence of the conspiracy knowingly committed at least one of the methods (or “overt acts”) described in the indictment; and
Fourth: That such “overt act” was knowingly committed at or about the time alleged in an effort to carry out or accomplish some object of the conspiracy-
For a definition of “willfully” the Government requested the following: “The word ‘willfully[,]’ as that term is used in the indictment or in these instructions, means that the act was committed voluntarily and purposely, with the specific intent to do something the law forbids; that is with bad purpose to either disobey or disregard the law.”[60] The district court, when instructing the jury, accepted the Government’s requested instructions and gave the instructions to the jury exactly as written above. The Government has never maintained, before the district court or this court, that the indictment, requested instructions, and actual jury instructions contained any mistakes. We therefore take the “willfully” language and the definition of “willfully” to be what the Government contends is an accurate statement of the law for the conspiracy charge.
Without question, then, criminal intent was an essential element to the conspiracy conviction. For the reasons described in part III.C., the jury had to be informed as to the legal status of the aliens under Cuban-specific immigration policy through reference to the CAA, the Weh-Foot/DryFoot policy, the Meissner Memorandum, and the Government’s implementation of *1102 that policy. Without this evidence, the jury was simply unable to make a finding that Dominguez acted with the criminal intent required for a conviction.
Thus, regardless of whether criminal intent was an element of the substantive offenses, there is no question that criminal intent was an element of the conspiracy charge in Count 1. Exclusion of evidence essential to the jury’s determination of whether Dominguez acted with lawful or unlawful intent was reversible error.
V.
Finally, although less compelling, even if the court somehow found that the evidence was properly excluded despite both the grounds explained above, there are additional reasons why Dominguez’s conspiracy and smuggling convictions still have to be reversed and a new trial granted. Dominguez’s knowledge of the government’s policy of treating undocumented Cubans as presumptive refugees entitled to apply for permanent residence status under the CAA was relevant to the question of whether Dominguez knew that the “prior official authorization” phrase of § 1324(a)(2) applied to the players.
Recall that to obtain a conviction under § 1324(a)(2), the Government must prove that the defendant knew[61] that the alien he was bringing to the United States “ha[d] not received prior official authorization to come to, enter, or reside in the United States.” As to the attempt to smuggle and smuggling counts, the district court instructed the jury on the elements of § 1324(a)(2)(B)(ii) as follows: Regarding the attempt to smuggle counts, the elements were:
First: That the defendant knowingly attempted to bring an alien to the United States;
Second: That the defendant knew such person was an alien;
Third: That the offense was done for the purpose of commercial advantage or financial gain.
As for the smuggling counts, the elements were:
First: That the defendant knowingly brought an alien to the United States; Second: That the defendant knew or was in reckless disregard of the fact that the alien had not received prior official authorization to come to or enter the United States; and
Third: That the offense was done for the purpose of commercial advantage or financial gain.
The court obviously erred in the attempt to smuggle instruction by omitting the “prior official authorization” phrase, and thus caused an attentive juror to have difficulty reconciling the attempt to and smuggle instructions. I need not pause to consider whether the omission constitutes reversible error because the district court erred in precluding Dominguez from testifying in full as to his state of mind throughout his involvement with the players. The jury needed to know what Dominguez knew about the application of the “prior official authorization” phrase as it applied specifically to Cuban refugees. Put another way, what did Dominguez know about the law?
A defendant is presumed to know the law. See Dimenski v. I.N.S., 275 F.3d 574, 578 (7th Cir.2001) (“In immigration law, as in tax law — and criminal law, too, where knowledge of the law is presumed — the *1103 Constitution permits the government to leave people to their own research.” (citation omitted)); Edwards v. United States, 334 F.2d 360, 366 (5th Cir.1964) (en banc) (“It is often stated that every person is ‘presumed’ to know the law.”).[62] What constituted the law that Dominguez should have known?
We start with 8 U.S.C. § 1324(a); he presumably knew its wording, including the “prior official authorization” phrase, which refers to the alien’s legal status. He also knew that, unlike aliens from other countries, the Meissner Memorandum authorized Cuban refugees to enter the United States anywhere, at a location other than a designated port of entry.[63] And the Wet-Foot/Dry-Foot policy authorized them to enter the United States without valid entry documents, and to remain here — even absent “prior official authorization.” Then, after the passage of a specified period of time, the USCIS entertained, in accordance with the CAA and the Meissner Memorandum, the refugees’ applications for adjustment of status to that of permanent residency regardless of how they entered the United States.
Finally, Dominguez is presumed to have known of the federal court decisions interpreting § 1324(a). He knew of our Zayas-Morales decision, in which the defendants were acquitted even though they knew that the refugees they brought here were “not lawfully entitled to enter or reside within the United States” and were warned by the U.S. Customs Service and the Coast Guard that, if they brought the refugees here, they would be prosecuted. 685 F.2d at 1274 (noting that the defendants stipulated that “[t]he object of the[ir] trip to and/or from Mariel, Cuba, was to bring back Cuban nationals without visas.”). The defendants were acquitted because they lacked the intent to violate the law; they brought the refugees here “so that [they] could seek political asylum or some other status which would permit them to come into the United States and remain.” Id.
The baseball players stood in the same shoes as the Zayas-Morales refugees; they were not lawfully entitled to come to the United States. And Dominguez stood in the same shoes as the Zayas-Morales defendants; he brought the players here so they could seek political asylum and *1104 remain in the United States — to play baseball.
Zayas-Morales implicitly held that, in light of the trier of fact’s finding (albeit a stipulated finding) that the defendants’ purpose in bringing the Cuban refugees to the United States was to enable the refugees to obtain political asylum, the words of the statute, “not lawfully entitled to enter or reside within the United States,” had no legal effect. The district court was bound to follow Zayas-Morales, including this implicit holding — unless it was able to engage in the analysis this court engages in here. From all I have been able to gather from the trial court record, including the district court’s order granting the Government’s motion in limine, the district court engaged in no such analysis; rather, it simply ruled irrelevant the immigration policy regarding Cubans. Although the district court was unable to explain why the policy was irrelevant, this court, in affirming the district court’s ruling today, attempts to provide an explanation.
This court’s explanation, however, does not address the fact that the Government had the burden of proving that Dominguez knew that the players lacked “prior official authorization” to enter — what Dominguez had in his mind while the players were en route to the Florida Keys. Dominguez eontends that he was free to say what was in his mind; he was helping the players obtain political asylum and permanent residence here. The district court said: No, the law was clear; what Dominguez had in his mind was irrelevant. Dominguez was mistaken about his view of the law, and “a mistake of law is no defense to criminal prosecution.” Order Granting Gov’t Mot. In Limine 2, Mar. 14, 2007.[64]
The district court was stating, in effect, that Dominguez knew what this court is saying today; that the “plain language of the statute” made it clear that the effect of the CAA and the Web-Foot/Dry-Foot policy on the players’ immigration status after they arrive[d] in the United States [was] not relevant. Ante at 1070.
Implicit in this court’s statement about the effect of the CAA and the Wet-Foot/Dry policy on the players’ immigration status after their arrival is a holding that the evidence the district court ruled irrelevant — the effect of such policy — was relevant to Dominguez’s prosecution for violating 8 U.S.C. § 1324(a)(1)(A)(ii), transporting the players from Florida to California in furtherance of the players’ “violation of law,” Counts 44 through 48, and 8 U.S.C. § 1324(a)(l)(A)(iii), harboring or shielding the players “from detection,” Counts 49 through 53.[65] The district court’s error *1105 in barring such evidence is of no consequence only because we are reversing Dominguez’s convictions on those ten counts on the sufficiency-of-the-evidence ground.
The impact of such evidence is relevant not only to Dominguez’s state of mind regarding the players’s immigration status after their arrival, but to their arrival as well. As I have shown, the policy provides Cuban refugees with unique authorization to arrive without documents at a location at a place other than a port of entry, an authorization aliens from other countries do not enjoy. I cannot understand how Dominguez could have harbored a mistake of law as to the players’ immigration status, i.e., the official authorization status.
The district court, in barring Dominguez from presenting evidence of the federal immigration policy as it pertains to Cuban refugees, instructed the jury as to his state of mind. Therefore, in barring this evidence, the court deprived Dominguez of his Sixth Amendment right to a trial by jury on a critical element of the § 1324(a)(2)(B)(ii) offense, whether he knew that the players lacked “prior official authorization to come to, enter, or reside in the United States.” The court today agrees that the players had the functional equivalent of “prior official authorization” to enter and reside; what they lacked was “prior official authorization” to come. This complex and unsettled distinction presents a procedural due process problem, a problem of notice. Dominguez would need a Philadelphia lawyer[66] to explain how this could possibly be so.
VI.
Accordingly, I would reverse Dominguez’s convictions under the smuggling counts, including the convictions for conspiracy to smuggle, Count 1; attempt to smuggle, Counts 5, 6, 10, 13, and 19; and smuggling, Counts 28, 29, 33, 35, and 40. Otherwise, I concur in the judgment of the court reversing Dominguez’s convictions for the transporting counts, Counts 44 through 48; and the harboring counts, Counts 49 through 53.

. 8 U.S.C. § 1324(a)(l)(A)(ii) (2006) states, in relevant part:
(1)(A) Any person who—
(ii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports ... such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law;
shall be punished as provided in subparagraph (B).

. 8 U.S.C. § 1324(a)(l)(A)(iii) (2006) states, in relevant part:
(1)(A) Any person who—
(iii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, ... harbors! 1 or shields from detection ... such alien in any place ...;
shall be punished as provided in subparagraph (B).

.18 U.S.C. § 371 states:
If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

.Both attempted smuggling and smuggling are violations of 8 U.S.C. § 1324(a)(2), which states:
Any person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien, regardless of any official action which may later be taken with respect to such alien shall, for each alien in respect to whom a violation of this paragraph occurs [be subjected to a fine or imprisonment, or both].
Section 1324(a)(2)(B)(ii) states that "[if] an offense [is] done for the purpose of commercial advantage or private financial gain,” the defendant shall "be fined under Title 18 and shall be imprisoned, in the case of a first or second violation of subparagraph (B)(i) or (B)(ii), not less than 3 nor more than 10 years, and for any other violation, not less than 5 nor more than 15 years.”

. Eleventh Circuit Pattern Jury Instructions (Criminal) at 35, Basic Offense Instruction 9.1A (defining “willfully” to mean an act with a general, not specific, criminal intent, or in other words, requiring a finding that the defendant acted "purposely, with the intent to do something the law forbids; that is, with the bad purpose to disobey or disregard the law.”).

. The district court also denied Dominguez the opportunity to present the same mens rea defense to the charges contained in Counts 44 through 53. The error is of no moment, however, because we are reversing the convictions for those counts on other grounds.

. 8 U.S.C. § 1255(a) states:
[t]he status of an alien who was inspected and admitted or paroled into the United *1077 States or the status of any other alien having an approved petition for classification as a VAWA self-petitioner may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.

.See Memorandum from Doris Meissner, Comm'r, INS, to all Regional Directors, all District Directors, all Chief Patrol Agents, and all Officers-in-Charge, file No. HQCOU 120/17-1, Eligibility for Permanent Residence Under the Cuban Adjustment Act Despite Having Arrived at a Place Other Than a Designated Port-of-Entry (April 19, 1999), available at http://www.uscis.gov/files/pressrelease/Cuban Parole_4Mar08.pdf ("Attachment-A”) [hereinafter the “Meissner Memorandum”]. The Meissner Memorandum instructs the officials of the United States Citizenship and Immigration Services, a component of the Department of Homeland Security, which succeeded the Immigration and Naturalization Service regarding Cuban refugee applications for permanent residency. See 6 U.S.C. § 271 (describing new authority of the United States Citizenship and Immigration Services).

. “The so-called ‘Wet-foot/Dry-Foot' policy ... applies to Cuban refugees who reach United States land. If they reach land, they are allowed to stay, apply for political asylum and eventually residency.” Movimiento Democracia Inc. v. Chertoff, 417 F.Supp.2d 1343, 1344 (S.D.Fla.2006). For a full explication of the Wet-Foot/Diy-Foot policy see part I, infra.

. A place designated by the Attorney General is often referred to as a "Port-of-Entry.” 8 C.F.R. § 100.4; see also 3 C.J.S. Aliens § 546 (defining an "arriving alien”).

. See 8 U.S.C. § 1182(a)(6)(A)© (2006) (regarding admission and parole); see also 8 U.S.C. § 1182(a)(7)(A)(i)(I) (regarding entry documents).

. 8 U.S.C. § 1158(a)(1) (2006) states, in pertinent part, “[a]ny alien who is physically *1078 present in the United States or who arrives in the United States (whether or not at a designated port of arrival ...), irrespective of such alien’s status, may apply for asylum____”
8 U.S.C. § 1158(b)(1)(A) states,
The Secretary of Homeland Security or the Attorney General may grant asylum to an alien who has applied for asylum in accordance with the requirements and procedures established by the Secretary of Homeland Security or the Attorney General under this section if the Secretary of Homeland Security or the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title.

.On applying for asylum, the alien may also apply for withholding of removal under 8 U.S.C. § 1231 (2006), which states in subsection (b)(3)(A), that "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.”

. In addition to applying for withholding of removal, the alien may seek relief under the Convention Against Torture, executed by the Foreign Affairs Reform and Restructuring Act, which states in pertinent part that,
[i]t shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States.
Foreign Affairs Reform and Restructuring Act of 1998, Pub.L. No. 105-277, div. G, § 2242(a), 112 Stat. 2681-761, 2681-822 (codified at 8 U.S.C. § 1231 note).

. A Cuban, like other applicants for asylum, may be denied asylum under certain extraordinary circumstances, including where "there are serious reasons for believing that the [Cuban] has committed a serious nonpolitical crime outside the United States prior to the arrival of the [Cuban] in the United States.” 8 U.S.C. § 1158(b)(2)(A)(iii).

. Cuba: Migration, U.S. Department of State, http://www.state.gov/www/regions/wha/ cuba/migration.html (last visited September 12, 2011).

. The Attorney General subsequently prescribed a regulation authorizing an alien meeting the eligibility requirements of the CAA to apply for adjustment of status to that of a lawful permanent resident to the [INS, now United States Citizenship and Immigration Services] director having jurisdiction over the alien's place of residence. See 8 C.F.R. § 245.2. This provision was amended in 2006, after the events involved in this case.

.Time magazine quoted President Jimmy Carter as stating that:
Ours is a country of refugees. We’ll continue to provide an open heart and open arms *1080 to refugees seeking freedom from Communist domination and from the economic deprivation brought about by Fidel Castro and his government.
Nation: Open Heart, Open Arms, Time, May 19, 1980, at 14.

. Mariel Boatlift, U.S. Coast Guard Alien Migrant Interdiction, Coast Guard Off. of L. Enforcement, http://www.uscg.mil/hq/cg5/cg 531/AMIO/mariel.asp (last visited September 12, 2011) (describing U.S. Coast Guard activity during the so-called Mariel Boatlift, a.k.a. the Freedom Flotilla).

. The district court explained it in these words:
8 U.S.C. § 1324(a)(1) requires that an entry be made either by fraudulent or surreptitious means. By admission and stipulation of the parties, no entry of aliens was effectuated by the defendants’ actions in these boatlift cases. As stated above, the defendants committed no crime in presenting the aliens at the border checkpoint.
United States v. Anaya, 509 F.Supp. 289, 299 (S.D.Fla.1980).

. We affirmed on a rationale not relied upon by the district court.

. 8 U.S.C. § 1324(a)(l)(A)(i) (2006) applies to anyone who,
knowing that a person is an alien, brings to or attempts to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry or place other than as designated by the Commissioner, regardless of whether such alien has received prior official authorization to come to, enter, or reside in the United States and regardless of any future official action which may be taken with respect to such alien.

.8 U.S.C. § 1324(a)(l)(B)(i) (2006) declares, in pertinent part: “A person who violates [§ 1324(a)(1)(A)®] shall, for each alien in respect to whom such a violation occurs ... be fined under Title 18, imprisoned not more than 10 years, or both.”

. 8 U.S.C. § 1324(a)(2) (2006) states,
[a]ny person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien, regardless of any official action which may later be taken with respect to such alien shall, for each alien in respect to whom a violation of this paragraph occurs [shall be subjected to a fine or imprisonment, or both].

. 8 U.S.C. § 1324(a)(2)(A) (2006) provides that a person violating § 1324(a)(2) “be fined in accordance with Title 18 or imprisoned not more than one year, or both” for each violation.

. 8 U.S.C. § 1324(a)(2)(B) (2006) provides that if the offense is:
(i) ... committed with the intent or with reason to believe that the alien unlawfully brought into the United States will commit an offense against the United States or any State punishable by imprisonment for more than 1 year,
(ii) ... done for the purpose of commercial advantage or private financial gain, or
(iii)an offense in which the alien is not upon arrival immediately brought and presented to an appropriate immigration officer at a designated port of entry,
[the violator shall] be fined under Title 18 and shall be imprisoned, in the case of a first or second violation of subparagraph (B)(iii), not more than 10 years, in the case of a first or second violation of subparagraph (B)(i) or (B)(ii), not less than 3 nor more than 10 years, and for any other violation, not less than 5 nor more than 15 years.

. The § 1324(a)(2) offenses of which Dominguez was convicted were “done for the purpose of commercial advantage or private financial gain.” See 8 U.S.C. § 1324(a)(2)(B)(ii).

. The number of Cuban "boat people" setting out for United States shores “steadily rose from a few hundred in 1989 to a few thousand in 1993.” Ruth Ellen Wasem, Cong. Research Serv., R40566, Cuban Migration to the United States: Policy and Trends 1 (2009), available at http://www.fas.org/sgp/ crs/row/R40566.pdf. Following a series of "threatening speeches” delivered by Fidel Castro, subsequent riots in the capital city of *1083 Havana, and a decree by the Castro regime that future attempts to go to the United States would not be contested, the Cuban flight to the United States reached nearly 40,000 in number in 1994 — the highest level since the Marielito exodus of 1980. Id.

. “Internal waters” is obviously a reference to the territorial waters of the United States.

. Codified as amended at 8 U.S.C. § 1229a.

.The confusion regarding the word "admissible” in the CAA was addressed by the Meissner Memorandum in 1999. It is not clear how long confusion or controversy surrounded this term.

. The CAA was amended by the Refugee Act of 1980, Pub.L. No. 96-212, § 203(i), 94 Stat. 102, 108. The 1980 Act reduced the “physical presence” requirement of the CAA from two years to one year.

. In this case, the Government presented no evidence to the effect that a "disqualifying criminal record or other factors” would bar any of the five Cuban players from obtaining CAA adjustment of status to lawful permanent residence.

. Testifying in the Government's case, Schneider said that Gray had done immigration work for TSI players since the late 1990s. During that time, Dominguez, through TSI, had represented 30 to 40 Cuban players; "probably 15” of those eventually reached the Major Leagues. According to his firm's website, Gray is "recognized as an expert on Immigration Law” and his firm, Humberto R. Gray, P.L.C.,
has represented many top foreign players playing in Major League Baseball. This esteemed list includes, [sic] Pedro Martinez, Ramon Martinez, Raul Mondesi, Andres Galarraga, Larry Walker, Jose Offerman, Ismael Valdez, Wilton Guerrero, Deivi Cruz, Ramiro Mendoza, Pedro Astacio and Mariano Rivera, to name a few.
Gray Law, http://www.graylaw.com/index. html (last visited September 12, 2011).

. In granting the Government's motion, the district court simultaneously denied Dominguez's request for a hearing on the motion.

. Nor did the court's instructions on the transporting and harboring offenses contain a criminal intent instruction.

.See supra note 4, for the text of 8 U.S.C. § 1324(a)(2).

. The question facing the court is not an argument that “the evidence supporting [Dominguez's] smuggling convictions [was] insufficient.” Rather, the argument is that the district court erred in ruling Dominguez's mens rea defense irrelevant.

. In reaching its conclusion, the court expressly rejects inclusion of criminal intent, holding that “a specific intent to violate the law is not required.” Ante at 1068. To be clear, I would not require proof of specific criminal intent. Rather, like our decision in Zayas-Morales, and the majority of decisions from other circuits who require mens rea, I would instead require proof of general criminal intent. This requires more than a showing that the defendant acted knowingly, see Eleventh Circuit Pattern Jury Instructions (Criminal) at 35, Basic Offense Instruction 9.1A (“The word 'knowingly means that an act was done voluntarily and intentionally and not because of a mistake or by accident”), but less than acting with specific intent. The Eleventh Circuit Pattern Jury Instructions (Criminal) at 35, Basic Offense Instruction 9.1A, explains the meaning of general criminal intent:
The word "willfully” means that the act was committed voluntarily and purposely, with the intent to do something the law forbids; that is, with the bad purpose to disobey or disregard the law. While a person must have acted with the intent to do something the law forbids before you can find that the person acted "willfully,” the person need not be aware of the specific law or rule that [his] [her] conduct may be violating.
The Eleventh Circuit Pattern Jury Instructions (Criminal) at 37, Basic Offense Instruction 9.IB, also explains the instruction for more rigorous standard of specific intent, requiring proof that "the act was done voluntarily and purposely with the specific intent to violate a known legal duty, that is, with the intent to do something the law forbids.” The comments following Basic Offense Instruction 9.1 A provide a helpful distinction between the two definitions of “willful.”

. The court’s analysis fails to recognize the distinction between the § 1324(a)(2) misdemeanor offense and the § 1324(a)(2)(B)(ii) felony offense. Here, Dominguez was tried and convicted for the felony offense.

. Amongst his "Offences Against Public Trade,” Blackstone identified the crime of "Smuggling,” which he classified as a felony. See 4 William Blackstone, Commentaries *155-56 (describing the common law crime of smuggling).

. This presumption does not apply in prosecutions for public welfare or regulatory offenses. See Staples v. United States, 511 U.S. 600, 606-07, 114 S.Ct. 1793, 1797-98, 128 L.Ed.2d 608 (1994) (noting that typically these prosecutions involve regulation of potentially harmful items or in areas of public health or safety); see also Nguyen, 73 F.3d at 891 n. 1 ("The government does not contend that section 1324(a)(1)(A) is a public welfare statute, nor could it. The 'public welfare' exception does not extend to offenses derived from the common law.”); Holdridge v. United States, 282 F.2d 302, 310 (8th Cir.1960) (Blackmun, J.) ("[Wjhere a federal criminal statute omits mention of intent and ... where the penalty is relatively small, where conviction does not gravely besmirch, [and] where the statutory crime is not one taken over from the common law, ... the statute can be construed as one not requiring criminal intent." (emphasis added)). Without question, § 1324(a)(2) does not create a public welfare or regulatory offense.

. Morissette v. United States, 342 U.S. 246, 251-52, 72 S.Ct. 240, 241, 96 L.Ed. 288 (1952) ("Crime, as a compound concept, generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand, was congenial to an intense individualism and took deep and early root in American soil.”).

. Dennis v. United States, 341 U.S. 494, 500, 71 S.Ct. 857, 862, 95 L.Ed. 1137 (1951) ("It has been suggested that the presence of intent makes a difference in the law when an 'act otherwise excusable or carrying minor penalties’ is accompanied by such an evil intent.”).

. As the Ninth Circuit in Nguyen explained, "we cannot accept the government’s leap from this premise to the conclusion that Congress intended to dispense with the mens rea requirement inferred by the Eleventh Circuit in Zayas-Morales.” Nguyen, 73 F.3d at 892 (reviewing history in light of changes to § 1324(a)(1)); see also United States v. Barajas-Montiel, 185 F.3d 947, 953 (9th Cir.1999) (concluding that "nothing, in the statute or legislative history, indicates that Congress intended to dispense with a mens rea requirement for the felony offense of violating 8 U.S.C. § 1324(a)(2)(B)”).

. It goes without saying that there are inherent problems with excessive reliance on am *1092 biguous legislative history. See Polycarpe v. E&S Landscaping Service, Inc., 616 F.3d 1217, 1224 (11th Cir.2010) (per curiam) ("Before proceeding, we must note that severe problems attend the use of legislative history in statutory interpretation; its analysis is a practice that we seek regularly to avoid.” (citing United States v. Fields, 500 F.3d 1327, 1333-35 (11th Cir.2007) (Carnes, J., concurring))).

. There are numerous other illustrations of courts reading in a criminal intent mens rea element to similar statutes. For another example, the statute in Morissette provided: "Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another ... [a] thing of value of the United States....” 18 U.S.C. § 641. The Supreme Court held that criminal intent was an essential element of the crime in any prosecution for "knowingly converging]” property of the United States. Morissette, 342 U.S. at 275, 72 S.Ct. at 256.

. Although the instruction contained the word willfully, it appears that it was not used in this context to confer any criminal intent element given that the Court notes, "[p]etitioner objected that this instruction required the jury to find merely that he knew that he was acquiring or possessing food stamps; he argued that the statute should be construed instead to reach only ‘people who knew that they were acting unlawfully.’ ” Liparota, 471 U.S. at 422-23, 105 S.Ct. at 2086.

. The Seventh Circuit specifically stated,
[w]e have no question that section 1324(a)(1)(B) implicitly requires the government to prove beyond a reasonable doubt not only that the defendant knew the alien he transported had entered this country in violation of immigration law, but also that the defendant knowingly transported the alien to further that violation, that is, acted willfully.
Parmelee, 42 F.3d at 390.

. In Morissette, the Supreme Court specifically noted,
[a]nd where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed.
Morissette, 342 U.S. at 263, 72 S.Ct. at 250.

. The district court sentenced Dominguez to concurrent prison terms of five years.

. See § 1324(a)(l)(B)(i) (describing punishment and, for all offenses other than those involving serious bodily injury, a threat to someone’s life, or the death of someone, noting that "in the case of a violation of subparagraph (A)(i) or (v)(I) or in the case of a violation of subparagraph (A)(ii), (iii), or (iv) in which the offense was done for the purpose of commercial advantage or private financial gain, be fined under Title 18, imprisoned not more than 10 years, or both”); § 1324(a)(1) (1976) (stating that violators "shall be guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $2,000 or by imprisonment for a term not exceeding five years, or both, for each alien in respect to whom any violation of this subsection occurs”).

. In its analysis, the Ninth Circuit heavily relied upon the severity of the potential punishments in concluding that § 1324(a)(2)(B) contained some mens rea requirement. See Barajas-Montiel, 185 F.3d at 953 (noting that te exact same concerns at issue in Nguyen are at issue in any analysis of § 1324(a)(2) because of “[t]he substantial overlap between the felony statutes and the serious penalties for their violation.”). The court dismisses Barajas-Montiel as unpersuasive, yet cites Nguyen with approval. I do not attempt to reconcile this inconsistency, concluding instead that both Barajas-Montiel and Nguyen are instructive.

.These figures include five years on the conspiracy count, 18 U.S.C. § 371. The 47 years' total sentence incorporates the three-year and five-year mandatory minimums prescribed by 8 U.S.C. § 1324(a)(2)(B); the 135 years’ total sentence incorporates the maximum sentences prescribed by that provision. These totals are, of course, theoretical. The mandatory minimums § 1324(a)(2)(B) prescribes required the court to impose sentences above the sentencing range prescribed by the applicable Sentencing Guideline, U.S. Sentencing Guidelines Manual § 2L1.1.

. Today the court addresses this question under the § 1324(a)(2)(B)(ii) offenses, but none of the cases it cites provides any significant analysis of this issue. See United States v. Garcia-Cordero, 610 F.3d 613, 619 (11th Cir.2010) (Korman, J., concurring) (asserting, without any citation for support that, "[c]onsequently, Congress enacted 8 U.S.C. § 1324(a)(2), which does not require general criminal intent, to make it a misdemeanor to engage in conduct of the kind at issue in the Mariel 'Freedom Flotilla' cases.”); United States v. Mussaleen, 35 F.3d 692, 698 (2d Cir.1994) (addressing an entirely different issue); see also Nguyen, 73 F.3d at 892-94 (holding that § 1324(a)(1)(A) requires proof of criminal intent because nothing in the statute or legislative history indicated that Congress "intended to dispense with the mens rea requirement assumed to be an element of every common law offense” and drawing a distinction between the felony § 1324(a)(1) and the misdemeanor § 1324(a)(2), in dicta, intimating that Congress may have dispensed with the mens rea requirement for the misdemean- or penalty under § 1324(a)(2)); but see Barajas-Montiel, 185 F.3d at 953 (rejecting any attempt in Nguyen to draw a distinction between § 1324(a)(1) and § 1324(a)(2)(B)).

. Compare 8 U.S.C. § 1324(a)(l)(A)(ii) (penalizing any person who "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law" (emphasis added)), and 8 U.S.C. § 1324(a)(l)(A)(iii) (penalizing any person who "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation” (emphasis added)), with 8 U.S.C. § 1324(a)(2) (penalizing any person who "knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien, regardless of any official action which may later be taken with respect to such alien shall, for each alien in respect to whom a violation of this paragraph occurs” (emphasis added)).

. It requires no citation of authority to say that the district court’s order granting the Government’s motion in limine was so comprehensive in its scope that Dominguez was relieved of the necessity of proffering the evidence he would have presented in his defense.

. Defendant's Requested Instructions Nos. 1, 2, 3, 17, 30, and 31.

. Dominguez was justified in reliance on an official Government policy, the Wet-Foot/ Dry-Foot policy, and the Meissner Memorandum, which was an official memorandum from the Commissioner of the I.N.S. for his belief that Cuban immigrants have a unique status under federal immigration policy. See United States v. Laub, 385 U.S. 475, 487, 87 S.Ct. 574, 581, 17 L.Ed.2d 526 (1967) ("Ordinarily, citizens may not be punished for actions undertaken in good faith reliance upon authoritative assurance that punishment will not attach.”); see also Raley v. Ohio, 360 U.S. 423, 438, 79 S.Ct. 1257, 1266, 3 L.Ed.2d 1344 (1959) (stating that individuals should not be punished when the statutes are "inexplicably contradictory” and therefore lead to good-faith mistakes) (citing United States v. Cardiff, 344 U.S. 174, 73 S.Ct. 189, 97 L.Ed. 200 (1952)); United States v. Barker, 546 F.2d 940, 947 (D.C.Cir.1976) (per curiam) (“[Ajlthough the basic policy behind the mistake of law doctrine is that, at their peril, all men should know and obey the law, in certain situations there is an overriding societal interest in having individuals rely on the authoritative pronouncements of officials whose decisions we wish to see respected.” (footnote omitted)).

. I note in passing that the Government requested a hybrid between the general intent definition of "willfully” and the specific intent version of "willfully” by essentially giving the pattern jury instruction for general intent, but adding the word "specific.” See supra note 39 for a comparison between the two pattern instructions. For the sake of clarity we will refer to the required intent for the conspiracy conviction as specific criminal intent, but whether general or specific criminal intent was the mens rea for the conspiracy count is irrelevant to my conclusion.

. Or was “in reckless disregard of the fact that the alien has not received prior authorization.” 8 U.S.C. § 1324(a)(2). In this case, the Government did not rely on this phrase; rather, it sought to prove that Dominguez knew of the players’ unauthorized status.

. In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

. For example, there are two provisions of 8 U.S.C. § 1324(a) that apply to all aliens that are not likely to apply in a case where a Cuban refugee arrives as a place other than a port of entry. They are §§ 1324(a)(l)(A)(i) and 1324(a)(2)(B)(iii):
(1)(A) Any person who—
(i) knowing that a person is an alien, brings to or attempts to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry or place other than as designated by the Commissioner, regardless of whether such alien has received prior official authorization to come to, enter, or reside in the United States and regardless of any future official action which may be taken with respect to such alien;
(2) Any person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien, regardless of any official action which may later be taken with respect to such alien shall, for each alien in respect to whom a violation of this paragraph occurs—
(B) in the case of—
(iii) an offense in which the alien is not upon arrival immediately brought and presented to an appropriate immigration officer at a designated port of entry

. A sound argument can be made that whether Dominguez’s knew that the players lacked "prior official authorization,” i.e., whether he knew of the players' immigration status, presented a question of fact, not of law. It is elementary that a person's state of mind is a fact. Whether the players had "prior official authorization” is also a question of fact. The Government’s proof of such fact came solely from the players, whom die Government called to the stand in its case in chief. They said they lacked "papers” entitling them to come to the United States. The jury heard nothing else regarding official authorization. Under this question of fact theory, the evidence the district court precluded the jury from hearing was admissible.

. As the district court correctly observed in a colloquy with counsel out of the jury's presence, the players, as Cuban refugees, were "entitled to be here under the policy. So be it. And that seems to me to be the end of it.” And again, "[o]nce they're here, they're here. They’re legally entitled to be here.” Having said this, I am at a loss as to why the court did not allow evidence of the players's immigration status to come before the jury regarding Counts 44 through 53.

. A "Philadelphia lawyer” is a lawyer knowledgeable in the most minute aspects of the law. Merriam-Webster's Collegiate Dictionary 872 (10th ed. 1993).